# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| TIFFANY K. MURRAY and KEVIN C. MURRAY, husband and wife,<br><br>        Plaintiffs,<br><br>vs.<br><br>CITY OF BONNERS FERRY and JOEL MINOR, in his official and individual capacities, and JOHN LUNDE, in his official and individual capacities, and STEPHEN BOORMAN, in his official and individual capacities; and STEVEN BENKULA, in his official and individual capacities, ROBERT BOONE, in his official and individual capacities, and JOHN DOES I-V, and JANE DOES 1-V,<br><br>        Defendants. | Case No.: 2:15-cv-00081-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT (Docket Nos. 34 and 56)**<br><br>**PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT TO INCLUDE A CLAIM FOR PUNITIVE DAMAGES AGAINST JOEL MINOR, STEVEN BENKULA, ROBERT BOONE AND STEPHEN BOORMAN (Docket No. 35)** |

Now pending before the Court are (1) Defendants' Amended Motion for Summary Judgment (Docket Nos. 34 and 56), and (2) Plaintiffs' Motion for Leave to File an Amended Complaint to Include a Claim for Punitive Damages Against Joel Minor, Steven Benkula, Robert Boone and Stephen Boorman (Docket No. 35). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. <u>GENERAL BACKGROUND</u>

Plaintiff Tiffany Murray began working for Defendant City of Bonners Ferry (the "City") as a police/patrol officer on or about September 2, 2008. On May 29, 2014, she was fired. The factual details occupying the space of Plaintiff's employment with the City are vast and, more

**MEMORANDUM DECISION AND ORDER - 1**

often than not, conflicting – suffice it to say, there appear to be no warm feelings between the relevant parties. Plaintiff's[1] description of those details are strident, and reflected in the various causes of action listed within her 53-page Complaint, including: (1) hostile work environment; (2) quid pro quo sexual harassment; (3) retaliation; (4) negligent hiring; (5) defamation; (6) negligent training and supervision; and (7) breach of the covenant of good faith and fair dealing. Plaintiff also contends that the same allegations informing these causes of action warrant a claim for punitive damages, and she moves to amend her Complaint accordingly. For their part, Defendants' Motion for Summary Judgment seeks the dismissal of certain of these causes of action as a matter of law. Defendants likewise oppose Plaintiff's efforts to add a claim for punitive damages.

## II. **LEGAL STANDARDS**

### A. **Summary Judgment**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."

---

[1] Kevin Murray, Tiffany Murray's husband, is also a Plaintiff in this action. However, to avoid confusion and maintain consistency, this Memorandum Decision and Order references only Mrs. Murray, unless otherwise specifically indicated.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case."  *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the court must not make credibility findings.  *See id*. at p. 255.  Direct testimony of the nonmovant must be believed, however implausible.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the court is not required to adopt unreasonable inferences from circumstantial evidence.  *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact.  *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).  This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor.  *See Devereaux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *Celotex*, 477 U.S. at 324.

However, the court is "not required to comb through the record to find some reason to deny a motion for summary judgment."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).  Instead, the "party opposing summary judgment must direct [the court's] attention to specific triable facts."  *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

**MEMORANDUM DECISION AND ORDER - 3**

**B.     Punitive Damages**

Claims for punitive damages are governed by Idaho Code § 6-1604, which provides:

> In any action seeking recovery of punitive damages, the claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted.

I.C. § 6-1604(1).

Whether to allow a claim of punitive damages is a substantive question controlled by Idaho law. *See Windsor v. Guarantee Trust Life Ins. Co.*, 684 F. Supp. 630, 633 (D. Idaho 1988). Ultimately, an award of punitive damages requires a bad act and a bad state of mind. *See Todd v. Sullivan Const. LLC*, 191 P.3d 196, 201 (Idaho 2008). The defendant must (1) act in a manner that was an extreme deviation from reasonable standards of conduct with an understanding of – or disregard for – the likely consequences, and must (2) act with an extremely harmful state of mind, described variously as with malice, oppression, fraud, or outrageousness. *See Myers v. Workmen's Auto Ins. Co.*, 95 P.3d 977, 983 (Idaho 2004); *see also* I.C. § 6-1604.[2]

At trial, the party alleging punitive damages must satisfy this standard by clear and convincing evidence. *See* I.C. § 6-1604(1). However, for purposes of a motion to amend, the party seeking to add a claim for punitive damages does not need to meet this high burden; rather, the party need only show "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *See* I.C. § 6-1604(2). Therefore, although FRCP 15(a) encourages the trial court to liberally grant motions to amend pleadings, this policy is substantially tempered

---

[2] The Idaho Supreme Court has recognized that, since the enactment of Idaho Code § 6-1604 in 1987, gross negligence or deliberate or willful conduct is not sufficient for an award of punitive damages. *See Cummings v. Stephens*, 336 P.3d 281, 296, n.5 (Idaho 2014) ("Since the enactment of the statute, gross negligence or deliberate or willful conduct is not sufficient for an award of punitive damages.").

**MEMORANDUM DECISION AND ORDER - 4**

by the requirements under Idaho law. That is, plaintiff may add a claim for punitive damages only if they establish a reasonable likelihood of proving, by clear and convincing evidence, that the defendant's conduct was oppressive, fraudulent, malicious, or outrageous.

Since plaintiffs are only required to demonstrate a "reasonable likelihood" of establishing their entitlement to punitive damages, on motions to amend to assert a claim for punitive damages under Idaho Code § 6-1604(2), courts apply the same standard it would apply in resolving an FRCP 50 motion at the close of plaintiffs' case. *See Bryant v. Colonial Sur. Co.*, 2016 WL 707339, *3 (D. Idaho 2016). That is, evidence is viewed in the light most favorable to plaintiffs, with the benefit of all legitimate inferences without assessing credibility. *See id.* (citing *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009)).

It is in the trial court's discretion to decide whether to submit the punitive damages issue to the jury. *See Manning v. Twin Falls Clinic & Hosp., Inc.*, 830 P.2d 1185, 1190 (Idaho 1992). As a matter of substantive law, it is well established in Idaho that punitive damages are not favored and should be awarded only in the most unusual and compelling circumstances, and are to be awarded cautiously and within narrow limits. *See id.* at 1185; *see also Jones v. Panhandle Distribs., Inc.*, 792 P.2d 315 (Idaho 1990); *Soria v. Sierra Pac. Airlines, Inc.*, 726 P.2d 706 (Idaho 1986); *Cheney v. Palos Verdes Inv. Corp.*, 665 P.2d 661 (Idaho 1983); *Linscott v. Rainier Nat'l Life Ins. Co.*, 606 P.2d 958 (Idaho 1980).

### III.  ANALYSIS

**A.  Defendants' Motion for Summary Judgment (Docket Nos. 34 and 56)**

1.  Hostile Work Environment Claim

To survive summary judgment on her hostile work environment claim, Plaintiff must raise genuine issues of material fact that (1) she was subjected to verbal or physical harassment

due to her gender, (2) the harassment was unwelcome, and (3) the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *See Kortan v. California Youth Authority*, 217 F.3d 1104, 1110 (9th Cir. 2000). Plaintiff must show that the conduct at issue was both objectively and subjectively offensive; that is, she must show that a reasonable person would find the work environment to be "hostile or abusive," and that she in fact did perceive it to be so. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). In that regard, courts are to "determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 777-78 (internal quotation and citation omitted). "Title VII does not prohibit genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Id*. (internal quotation and citation omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id*. (internal quotation and citation omitted).

Within her Complaint, Plaintiff originally identified several circumstances which the Court presumes are part of what she contends contributed to her hostile work environment claim, including:

- On November 3, 2010, Defendant Sergeant John Lunde falsely accused Plaintiff of breaking city equipment, specifically the audio microphone that officers wear while on duty;

**MEMORANDUM DECISION AND ORDER - 6**

- On November 6, 2011, Sergeant Lunde made a statement to other employees of the City that Plaintiff was an "overtime whore";

- In November 2011, Sergeant Lunde looked through Plaintiff's personal hiring file without authorization, in violation of City policy;

- The City did not take the steps necessary to ensure that Plaintiff's hiring file was secure from unauthorized access, and this damaged Plaintiff;

- In July 2012, Sergeant Lunde did an internal affairs investigation of Plaintiff without a formal complaint, in violation of City policy;

- Plaintiff's complaints to the Chief of Police (Rick Alonzo and, later, Defendant Steven Benkula) were either ignored or inadequately investigated;

- On June 30, 2013, Sergeant Lunde sent an email to all police officers in the city, using every police officer's proper name, but referred to Plaintiff as "Six Pack Murray";

- Plaintiff was isolated from the rest of the City's employees, drawing negative attention to her;

- On August 5, 2013, Sergeant Lunde gained access to Plaintiff's protected medical information and sent that information to a third party; and

- The City took insufficient steps to security Plaintiff's protected medical information.

Compl., ¶¶ 38-73 (Docket No. 5). Though some of these instances are undoubtedly unsavory, it cannot be said as a matter of law that they – either singularly or in combination – reflect an objectively hostile work environment under Title VII. Plaintiff does not appear to disagree, relying instead on *other* events – involving altogether different actors – alleged elsewhere in her Complaint. *See, e.g.*, Pls.' Opp. to MSJ, pp. 8-9 (Docket No. 41) (to exclusion of Sergeant Lunde, stating: "The actions of Deputy Chief Minor, Chief Benkula, Chief Boone, the City Administrator, City Attorney and City Clerk created this hostile work environment."). In this evolving respect, Plaintiff states:

- Defendant Joel Minor, Assistant Chief of Police and Plaintiff's direct supervisor, made many sexual advances, including:

**MEMORANDUM DECISION AND ORDER - 7**

- Squeezing Plaintiff's buttocks;

- Placing his hand on Plaintiff's breasts, pulling the front of Plaintiff's uniform, and peering at her breasts, and saying that Plaintiff has nice breasts;

- Recounting dreams involving sex and sexual positions with Plaintiff;

- Asking to have sex with Plaintiff;

- Asking Plaintiff to sit on his face; and

- Telling Plaintiff that pregnant women are sexy, while Plaintiff was pregnant.

- Assistant Chief Minor watched pornography (including pregnant women having sex) during work hours in Plaintiff's presence and attempted to show Plaintiff pornography during work hours;

- Chief Benkula knew, or should have known, that Assistant Chief Minor was engaging in sexual harassment, but did little;

- In June 2013, Defendant Stephen Boorman, as the City Administrator, falsely made allegations regarding Plaintiff, stating that she was trying to file a false claim of work injury in order to get time off work;

- City Administrator Boorman (with an office in City Hall, along with the Police Department)[3] allowed the display of two sex dolls – an African American female and a sheep – in a City shop under his control;

- City Administrator Boorman allowed the display of racist and sexist pictures in a City shop under his control, including:

    - A picture of President Obama, sitting next to his wife, photo-shopped to include a white man holding his undivided attention with a banana;

---

[3] In Plaintiff's myriad allegations, City Administrator Boorman's alleged involvement is unquestionably more removed from Assistant Chief Minor's alleged involvement – particularly when understanding that Plaintiff may never have seen any of the allegedly offensive displays. *See* Pl.'s Dep., 70:23-72:8, 74:11-75:6 (Docket No. 41, Att. 6). However, it is difficult to neatly extricate City Administrator Boorman from Plaintiff's hostile work environment claim at this time, owing to the City's small-town nature, alongside his proximity and familiarity (both physical and social) to the Police Department itself – that is, it is unclear whether, or to what extent, City Administrator Boorman had direct (or latent) influence over the Police Department given his role with the City and the fact that they shared space at City Hall.

**MEMORANDUM DECISION AND ORDER - 8**

- A picture of a man engaging in mock bestiality with a target deer;

- A picture displaying an Arabic word translated into "Infidel";

- A picture of mock advertisement for "Orville Redenbacher's COCK"; and

- A picture with a man who has both of the above-referenced sex dolls pressed against his crotch.

Compl., ¶¶ 74-117 (Docket No. 5); *see also* Pls.' Opp. to MSJ, pp. 8-9 (Docket No. 41) (referencing pictures, sex dolls, and Assistant Chief Minor's conduct as actual basis for hostile work environment claim); Pl.'s Dep., 44:2-46:11 (Docket No. 41, Att. 6).

It is assumed that Plaintiff, in fact, perceived this alleged conduct as hostile and abusive. Further, the Court holds that a reasonable jury could conclude that any differences in the way men and women interact were not, as the Defendants implicitly argue, the sort of innocuous dealings that are not actionable. *See supra* (citing *Faragher*, 524 U.S. at 788). Rather, a reasonable jury could find an objectively hostile or abusive environment, because of the nature, frequency, permanence, and cumulative effect of the alleged conduct towards women in general and Plaintiff in particular. *See Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1206 (9th Cir. 2016).[4] Also, a reasonable jury could conclude that Assistant Chief Minor and City Administrator Boorman – officials within the City/Police Department – had "greater power to

---

[4] The Court is cognizant of the fact that Defendants appropriately argue that there could be no hostile work environment given Plaintiff's participation or reaction to Defendants' allegedly-offending conduct (assuming, without deciding, that such conduct, in fact, occurred). *See* Defs.' Mem. in Supp. of MSJ, pp. 8-9 (Docket No. 56) ("When the court looks at the totality of the circumstances, the conduct that Tiffany complains of does not appear to be unwelcome by Tiffany."). Even if that argument is put forward at trial, at this stage of the litigation, the evidence must be viewed in her favor and, doing so, warrants the denial of Defendants' Motion for Summary Judgment on this point. Had roles been reversed and Plaintiff moved for summary judgment on her hostile work environment claim, those same factual discrepancies would have similarly prevented the entry of summary judgment in her favor.

**MEMORANDUM DECISION AND ORDER - 9**

alter [Plaintiff's] environment." *Faragher*, 524 at 805. Accordingly, summary judgment on the question of hostile work environment is inappropriate; Defendants' Motion for Summary Judgment is denied in this respect.

Notwithstanding the general viability of Plaintiff's hostile work environment claim, the City can escape vicarious liability created by Plaintiff's supervisors (Assistant Chief Minor and, perhaps, City Administrator Boorman) if it can show (1) it exercised reasonable care to prevent and correct any harassing behavior by Plaintiff's supervisors, and (2) Plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the City provided. *See Vance v. Ball State Univ.*, 570 U.S. 2434, 2439 (2013) . This affirmative defense (asserted by the City) is available only where Plaintiff suffered no tangible job consequences as a result of the supervisors' actions. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

Plaintiff argues that she experienced tangible job consequences resulting from her supervisors' harassment (and resultant hostile work environment) in two respects: (1) when Assistant Chief Minor ordered Sergeant Lunde "to stop writing [Plaintiff] up"; and (2) when Chief Benkula, "working in concert with [Assistant Chief] Minor, placed [Plaintiff] on probation for resisting [Assistant Chief] Minor's sexual harassment by reporting it." Pls.' Opp. to MSJ, p. 5 (Docket No. 41). The Court disagrees.

First, any efforts to prevent Sergeant Lunde from "writing [Plaintiff] up" is not a tangible employment action[5] and is too far removed (*see infra*) from Assistant Chief Minor's alleged harassing conduct. *Cf. Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959 (9th Cir. 2004)

_____

[5] Tangible employment actions including hiring, firing, demoting, promoting, transferring, or disciplining the victim. *See Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2439 (2013). No such actions took place vis à vis Assistant Chief Minor's interaction with Sergeant Lunde.

**MEMORANDUM DECISION AND ORDER - 10**

("Moreover, even if a tangible employment action occurred, an employer may still assert the affirmative defense if the tangible employment action 'was unrelated to any harassment or complaint thereof.'") (quoting *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 877 (9th Cir. 2001)). Second, Chief Benkula placed Assistant Chief Minor on administrative leave immediately after Plaintiff served her Notice of Tort Claim (formally identifying and complaining of Assistant Chief Minor's conduct) on August 6, 2013, and an independent investigation of Plaintiff's claims followed. *See* Benkula Dep., 102:1-25 (Docket No. 36, Att. 2); *see also* 9/24/13 Birch Rpt. (Docket No. 41, Att. 9). Such conduct is inconsistent with Chief Benkula and Assistant Chief Minor subsequently conspiring to take a tangible employment action against Plaintiff (based on the allegedly harassing behavior for which Assistant Chief Minor was initially disciplined).[6]

Moving on to the two prongs of the defense, first, the City exercised reasonable care to address the alleged harassing conduct when, upon being notified of Plaintiff's Notice of Tort Claim, Chief Benkula immediately disciplined Assistant Chief Minor and requested an investigation of the claimed incidents.[7] That Plaintiff ultimately disagreed with the manner in

---

[6] To the extent Plaintiff claims that she was placed on probation for reporting Assistant Chief Minor's alleged sexual harassment, that issue is more fully discussed in the context of Plaintiff's retaliation claim. *See infra.*

[7] Plaintiff argues that the City was actually aware of Assistant Chief Minor's alleged harassment on January 15, 2013 when, during a Proposed Action Hearing, "[Sergeant] Lunde informed Chief Benkula twice that he believed that [Assistant Chief] Minor was engaging in inappropriate sexual harassment with [Plaintiff]" and "[Sergeant] Lunde reminded [Chief] Benkula that he had previously informed [Chief] Benkula of this, in the presence of [Sergeant] Minor." Pls.' Opp. to MSJ, p. 5 (Docket No. 41); *see also* Stmt. of Disp. Fact Nos. 7-8 (Docket No. 41, Att. 1). The Court's review of the record on this point, however, reveals that it was Judy Jensky who was complaining of conduct between Plaintiff and Assistant Chief Minor that made *Ms. Jensky* uncomfortable – not necessarily Assistant Chief Minor sexually harassing Plaintiff. *See, e.g.*, Proposed Action Hearing, LUNDE_319:915-918, 922-927 (Docket No. 41, Att. 15)

**MEMORANDUM DECISION AND ORDER - 11**

which the investigation was conducted as well as its outcome, without more, does not amount to the City failing to exercise reasonable care in responding to Plaintiff's complaints of sexual harassment as of August 6, 2013. Second, Plaintiff knew that the City and the Police Department had a sexual harassment policy, and she was aware of her "responsibility" to inform her supervisor, Department Head, Mayor, City Clerk, or legal counsel for the City of any harassment. *See* Pl.'s Dep., 53:1-57:25 (Docket No. 36, Att. 1). However, Plaintiff did not complain to the City or the Police Department about Assistant Chief Minor's alleged harassing behavior until August 6, 2013 – approximately three years after she alleges that Assistant Chief Minor first began harassing her. In short, Plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the City provided.

Hence, even though Plaintiff's hostile work environment claim survives summary judgment, the City is not responsible for Plaintiff's supervisors' offending conduct in this regard, if any; Defendants' Motion for Summary Judgment is granted in this respect.

2.    <u>Quid Pro Quo Sexual Harassment Claim</u>

To prove actionable sexual harassment under a quid pro quo theory under Title VII, Plaintiff must show that Assistant Chief Minor "explicitly or implicitly conditioned her job, a job benefit, or absence of detriment on her acceptance of sexual conduct." *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1054 (9th Cir. 2007). In support of her quid pro quo sexual

---

("John advises [Judy] that she needs to report it as – if she's offended by it which is pursuant to the class that City made 'em go to. Judy says she's offended by it and asked to put ear plugs in her ears, and she is reporting it to John who is the sergeant. . . . . That was Judy – 'cause she made some comment, and I [(Sergeant Lunde)] said, 'I don't know how you do it.' She pulls her hair back, and she's got ear plugs in, and she goes, 'I have to wear ear plugs to be able to deal with what's going on.' You and I both know Judy, so Judy gets kind of upset and Judy gets kind of vocal about certain things. But they're valid complaints.").

**MEMORANDUM DECISION AND ORDER - 12**

harassment claim, Plaintiff claims that, in exchange for sexual favors, Assistant Chief Minor protected her from Sergeant Lunde:

> The act of [Assistant Chief] Minor protecting [Plaintiff] from [Sergeant] Lunde and expecting that [Plaintiff] allow him to grope, fondle, and harass her is a tangible employment action. There is no doubt that [Sergeant] Lunde attempted to get [Plaintiff] fired and that [Assistant Chief] Minor protected [Plaintiff] from [Sergeant] Lunde's actions. . . . . We have [Assistant Chief] Minor, who was [Plaintiff's] supervisor, making unwelcome sexual advances that a jury could reasonably find were directly linked to him protecting [Plaintiff] from [Sergeant] Lunde. [Assistant Chief] Minor's employment protection benefits prevented [Sergeant] Lunde from "writing her up" so she could keep her job.

Pls.' Opp. to MSJ, p. 3 (Docket No. 41); *see also* Stmt. of Disp. Fact No. 4 (Docket No. 41, Att. 1) ("[Plaintiff] believed that she was stuck between a rock and a hard place. [Plaintiff] did not report [Assistant Chief] Minor until August 6, 2016. If she did report, then [Sergeant] Lunde would be after her job and she would have no protection. [Sergeant] Lunde wanted her job; [Assistant Chief] Minor wanted her body."); *see also* Pl.'s Dep., 69:3-5 (Docket No. 41, Att. 6) ("[Assistant Chief Minor] protected me, but in order to do that, I had to submit to his unwanted physical advances and verbal abuse.").

Relevant here, Plaintiff admits that Assistant Chief Minor never explicitly conditioned his protection of Plaintiff from Sergeant Lunde, instead testifying at her deposition that it was understood given their interactions:

> Q:      Did he tell you that?
>
> A:      Did he tell me, "I'm protecting you if you let me touch you? No, he didn't say those words.
>
> Q:      How did you link the two together?
>
> A:      Because when I told [Assistant Chief Minor], at one point, that I told my husband about what he was doing, he became angry with me, to the point where I was actually kind of scared of him. And so I backed off. And it was

> – if [Assistant Chief] Minor was mad at me, then he wasn't telling [Chief Alonzo] or [Chief] Benkula.  It was when [Assistant Chief Minor] was happy, after he would touch me, that he would be, "I've got your back. Don't worry about it."
>
> Q:     And when he was angry with you, when you'd tell him to stop, you're saying that he would not talk to [Chief] Benkula about [Sergeant] Lunde?
>
> A:     He wouldn't – he would just kind of freeze up.  I didn't know what he was doing, but I know that I didn't have his protection.

Pl.'s Dep., 69:6-23 (Docket No. 41, Att. 6); *see also id*. at 47:15-22 (testifying that Assistant Chief Minor said "don't worry about [Sergeant] Lunde.  I've got your back.  Don't worry about it.  He can't do anything," but not referencing any touching).

In this setting – when the request for sexual favors and the conditioning of benefits is implicit rather than explicit – a plaintiff must show that the supervisor's words or conduct would communicate to a reasonable woman in the employee's position that sexual favors were requested and that such participation is a condition of employment.  *See Holly D v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1173-74 (9th Cir. 2003).  As the Ninth Circuit discussed in *Holly D*, this is not always easy, but nonetheless requires more than conclusory allegations at the summary judgment stage:

> [W]e reiterate that the most 'difficult factual and legal questions will almost always arise whenever either the conditioning of benefits (or absence of detriment) or the request for favors is not explicit, but is instead implicit in the harasser's communications or dealings with his prey. . . .  Harassment in cases of implicit conditioning can be inferred only from the particular facts and circumstances of the case.  We must examine each such charge with the utmost care, for an error either way can result in a gross injustice and will often have a disastrous impact on the life of whichever person is truly the injured party.'  In some cases, an injustice can result simply from allowing an unmeritorious case to proceed to trial; in others, it may result from the denial of a fair hearing to a legitimate victim of sexual harassment. *Either way, in cases alleging that an employee engaged in sexual relations because her supervisor implicitly demanded that she do so as a condition of her employment, we require more than conclusory allegations that the supervisor proposed a sexual*

> *liaison and the employee responded to the overtures in order to protect her employment interests.*

*Id*. at 1174 (quoting *Nichols v. Frank*, 42 F.3d 503, 512 (9th Cir. 1994) (emphasis added)). Under this standard, Plaintiff has not met her burden.

In *Holly D*, as is the case here, the Ninth Circuit considered the issue of whether an employee who submits to a supervisor's implicit quid pro quo threats has suffered a tangible employment action. The plaintiff was a Senior Division Assistant for Caltech University, working under the direction of Professor Stephen Wiggins. *Holly D*, 339 F.3d at 1162. While employed, the plaintiff alleged that Professor Wiggins eyed her chest and buttocks, made inappropriate comments of a sexual nature, and exposed her to pornographic websites. *See id*. at 1163. Eventually, the plaintiff submitted to Professor Wiggins's sexual advances and engaged in a year-long sexual relationship with him, believing that she needed to engage in and continue the relationship in order to "keep her job." *Id*. After the plaintiff ended the sexual relationship with Professor Wiggins, she applied for several positions at Caltech, but was unsuccessful. *See id*. at 1164. Thereafter, the plaintiff filed sexual harassment claims under Title VII against Professor Wiggins and Caltech asserting that, although she was never told that she would be fired, demoted, or otherwise penalized if she refused, there was an implication that her continued employment depended on her complying with Professor Wiggins's unwelcome sexual advances. *See id*. at 1162.

The district court granted partial summary judgment for the defendants, holding that the plaintiff had not suffered a "tangible adverse employment action" because she remained in her position, received salary increases, and was not denied any tangible employment benefit. *See id*. at 1165. On appeal, the Ninth Circuit departed from the district court in finding that the plaintiff

alleged a tangible employment action under Title VII insofar as she contended that she was coerced into performing unwanted sexual acts with her supervisor, by threats that she would be discharged if she failed to comply with his demands – that is, the fact that the plaintiff retained her job did not mean, ipso facto, that she had not suffered a tangible adverse employment action. *See id.* at 1170 ("Most significant for this appeal, if a supervisor commits a 'tangible employment action' by 'firing' an employee because she refuses to enter into a sexual relationship, a 'tangible employment action' must also occur when he determines not to fire her because she has performed the sexual acts he demanded."). Still, the Ninth Circuit affirmed summary judgment because the plaintiff "has not presented sufficient evidence to raise a genuine issue of material fact with respect to whether [Professor] Wiggins conditioned her continued employment, implicitly or otherwise, on her having sex with him." *Id.* at 1175. On this point, the Ninth Circuit concluded:

> Even assuming, without deciding, that [Professor] Wiggins created an uncomfortably sexualized environment and that he was a difficult and demanding boss, the evidence in this case does not permit the inference that his conduct, implicit or explicit, would have caused a reasonable woman in [the plaintiff's] position to believe that her continued employment was dependent upon her providing him with sexual favors, or that there would be no point in declining his first invitation to engage in sex. [The plaintiff] has produced no evidence whatsoever *connecting* any discussion of her job duties with [Professor] Wiggins's requests that she engage in sexual acts with him. Nor is there any evidence that [Professor] Wiggins ever mentioned any potential change in her employment status, or indeed any job-related matters of problems, during nay discussion regarding her participation in sexual acts with him, or while actually engaged in such acts. . . . The mere fact that [the plaintiff] received a less than enthusiastic initial job evaluation weeks earlier does not, without more, support her contention that her compliance with [Professor] Wiggins's initial request for sex was necessary to save her job. Moreover, other than her vague and unsupported allegation that during the course of their one-and-a-half-year sexual relationship, [Professor] Wiggins grew 'supercritical' when she rejected his advances, [the plaintiff] has presented no evidence that would cause a reasonable woman in her position to believe that [Professor] Wiggins suggested, directly or indirectly, the existence of a connection between her job security and his request for sex. [The

plaintiff's] unsubstantiated assertions describing [Professor] Wiggins's behavior in so vague and general a manner are not sufficient to overcome the motion for summary judgment.

*On this record*, drawing all inferences and resolving all disputed facts in her favor, [the plaintiff] has not presented sufficient evidence to allow a jury to find that a reasonable woman in her position would have believed that, in order to keep her job, she was required to accept [Professor] Wiggins's initial invitation to engage in sex or thereafter to continue the sexual liaison over a one-and-a-half-year period. The mere fact that [Professor] Wiggins was interested in sex generally and desired to have sex with [the plaintiff] is simply not enough.

*Id*. at 1175-76 (emphasis in original).

Like the plaintiff in *Holly D*, Plaintiff has not shown that her submission to Assistant Chief Minor's alleged unwelcome advances was an express or implied condition for receiving job benefits (in this case, protection from Sergeant Lunde), or that her refusal to so submit to those same alleged advances resulted in a tangible job detriment. Rather, the evidence paints the picture of two people working in close proximity with one another, with conduct that, while possibly pushing the envelope of boorish and lewd behavior, does not rise to the level of *quid pro quo* sexual harassment. Simply put, the otherwise unadorned comments about having someone's "back," or stated beliefs that someone was either "happy" or would "freeze up" depending on whether sexual advances/touching were permitted, are insufficient to create the necessary nexus between conduct and consequence to survive summary judgment under *Holly D*. *See, e.g.*, 9/24/13 Birch Rpt., p. 31 (Docket No. 41, Att. 9) (summary of investigation following Plaintiff's Notice of Tort Claim, stating: "[Plaintiff] has made general allegations against [Assistant Chief] Minor, though she has alleged specific acts or statements, she was not able to reference these alleged acts with the context of time or location."). Plaintiff's quid pro quo

sexual harassment claim is therefore dismissed; Defendants' Motion for Summary Judgment is granted in this respect.[8]

      3.    <u>Retaliation Claims</u>

Plaintiff alleges that the City engaged in a series of retaliatory acts after she filed her Notice of Tort claim. *See* Compl., ¶¶ 118-305 (Docket No. 5). To prove a prima facia case of unlawful retaliation, Plaintiff must establish that (1) she engaged in a protected activity; (2) an adverse employment action was taken; and (3) a causal link exists between the two events. *See Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 188 (9th Cir. 2005). If successful, the burden then shifts to Defendants "to present legitimate reasons for the adverse employment action" and, upon carrying this burden, Plaintiff "must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext" – "[o]nly then does the case proceed beyond the summary judgment stage." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). In establishing pretext, it must be shown that the proffered reason is not only false, but that the alleged discrimination is in fact the real reason behind the adverse conduct. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) ("But a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.").

Defendants do not dispute that Plaintiff engaged in protected activity when she lodged her sexual harassment complaint. *See* Defs.' Mem. in Supp. of MSJ, p. 13 (Docket No. 56). Still, with respect to each instance of their alleged retaliation for her doing so, Defendants argue

---

    [8] Plaintiff attempts to group in Chief Benkula (along with Assistant Chief Minor) into her quid pro quo sexual harassment claim. *See* Pls.' Opp. to MSJ, pp. 2, 4 (Docket No. 41). However, such an extension of the claim to Chief Benkula is misplaced, given that the claim against Assistant Chief Minor cannot stand in the first instance.

**MEMORANDUM DECISION AND ORDER - 18**

either that there was no adverse employment action, no link between Plaintiff's protected activity and any adverse employment action, and/or non-pretextual legitimate reasons for any adverse employment action.  *See id*. at pp. 13-18.

    *a.*    *Plaintiff's November 19, 2013 Probation*

   The day after receiving Plaintiff's Notice of Tort Claim, Chief Benkula requested that the Office of the Attorney General investigate "Bonners Ferry Police Officer Tiffany Murray's allegations that members of the Bonners Ferry city government and police department created a Hostile Work Environment and an atmosphere of Quid Pro Quo sexual harassment."  *See generally* 9/24/13 Birch Rpt. (Docket No. 41, Att. 9).  Within his September 24, 2013 report following the requested investigation, Chief Investigator Scott Birch concluded that Plaintiff had received a copy of the City's personnel policies; that she had signed an "Acknowledgment of Receipt of City of Bonners Ferry Personnel Policy"; that the "policy contained language which specifically addressed sexual harassment and the responsibility of all employees whether they are witnesses to or victim of sexual harassment"; and that she had not reported her issues with Assistant Chief Minor.  *See id*. at pp. 31-32.[9]

   After receiving Investigator Birch's report, Chief Benkula performed a supplemental investigation because he "had more questions that needed answers...."  Supp. Rpt., p. 1 (Docket No. 41, Att. 10).  That supplemental investigation largely involved meeting with Plaintiff and her

---

   [9]  Notably, Investigator Birch's report makes no reference concerning the merits of Plaintiff's allegations.  Rather, it simply detailed the various factual accounts/input from the approximately sixteen individuals interviewed, along with related documentary evidence (previous investigation and polygraph examination reports).  *See generally* 9/24/13 Birch Rpt. (Docket No. 41, Att. 9).

**MEMORANDUM DECISION AND ORDER - 19**

attorney "in an attempt to get answers to [Chief Benkula's] questions concerning the

investigation. *Id*. at p. 2. In the end, Chief Benkula concluded:

> Although I believe some inappropriate activities occurred between Deputy Chief Minor and Cpl. Murray, it is difficult to prove that the serious "quid pro quo" allegations occurred. Deputy Chief Minor admitted that there was joking and horseplay. He also admitted to watching pornographic videos on his phone and may have shown a video to Cpl. Tiffany Murray.

> I find it hard to believe that Cpl. Murray kept such a detailed journal on her issues with Sgt. Lunde and that everyone knew of her issues with him. It was not the best kept secret. According to Cpl. Murray, the problems with Deputy Chief Minor started over 4 years ago. In August or September of 2012 I obtained copies of Cpl. Murray's Journal on Sgt. Lunde from Cpl. Murray. The journal entries started earlier however when her journal was brought to my attention I was only concerned with the most recent 2 years. In two years worth of journal I have over 30 pages of issues Cpl. Murray had with Sgt. Lunde. Dealing with Deputy Chief Minor for the past 4 years there was not one journal entry by Cpl. Murray and she did not tell one person except for her husband Kevin. This leads me to question as to whether this was more of a planned event rather than an actual occurrence. This, however, is tough to prove.

> The most important piece of evidence we have is the polygraph that both Deputy Chief Minor and Cpl. Murray took. Deputy Chief Minor passed his polygraph and Cpl. Murray showed deception. The polygraph examiner, Lt. Mike Calderwood with the Coeur d'Alene Police Department stated that there is a possibility that Cpl. Murray failed due to "reliving" events. Victims often fail polygraphs due to reliving the event and that is why he does not promote giving polygraphs to victims. With Deputy Chief [Minor] passing his polygraph, it does show that he is being truthful in his answers.

> Cpl. Murray did not follow the city of Bonners Ferry Personnel Policy regarding harassment. It gave her several options to report her issues and she failed to do so. The police department and city staff did not know of the problem until we were served with the tort claim on August 6th, 2013. The police department immediately placed Deputy Chief Minor on Administrative Leave and asked for an outside investigation into this matter. Cpl. Murray will be disciplined for not following the Bonners Ferry Policy on reporting harassment.

> Deputy Chief Minor resigned his position before the investigation was completed and therefore no discipline could be administered. The reason for the resignation was he accepted a position with the Kootenai Tribe of Idaho that began October 21st, 2013.

*Id*. at pp. 6-7.

**MEMORANDUM DECISION AND ORDER - 20**

Then, in a November 19, 2013 memorandum, Chief Benkula placed Plaintiff on

probation for one year for failing to report the alleged sexual harassment. *See* 11/19/13 Mem., p.

1 (Docket No. 37, Att. 4) ("This memo will serve as notice of disciplinary action that will be

taken due to your failure to follow the city of Bonners Ferry Policy Manual regarding

Harassment."). As justification for the probation, Chief Benkula provided:

> An investigation was conducted during which you stated that you had been
> experiencing harassment issues for approximately 4 years. During those four years
> you failed to fulfill your obligation of informing your supervisors, department head,
> mayor or the city's legal counsel regarding this harassment per department policy.
> This not only put you into harm's way, but potentially put other employees in harm's
> way as well.
>
> As a police officer you are expected to protect yourself and others and keep them
> from harm. You are also expected to follow the City of Bonners Ferry and the
> Bonners Ferry Police Department policies at all times.

*Id.* Plaintiff now claims that, by placing her on probation, the City retaliated against her for

filing her Notice of Tort Claim.

Plaintiff presents a prima facie case of retaliation on this point – she engaged in protected

activity (reporting sexual harassment); she suffered an adverse employment action (she was

placed on probation); and there is a connection between the two events (though, ironically, she

was placed on probation because she did *not* internally report the alleged sexual harassment).

Assuming a connection between events, Defendants, in turn, put forward what they believe to be

a legitimate reason for the probation – that is, Plaintiff's failure to follow proper harassment

reporting procedures. It is unclear, however, whether Defendants' reason for Plaintiff's

probation is pretextual – that is, beyond simply rejecting Plaintiff's harassment claims, was the

action of additionally placing Plaintiff on probation appropriate in light of the language used in

the various City/Police Department policies at play (and related notice of the consequences for failing to timely report a protected activity like sexual harassment)?  This question is not answered here, but the fact of the question does prevent summary judgment on the issue of pretext.  *See Reece v. Pocatello/Chubbuck School Dist. No. 25*, 713 F. Supp. 2d 1222, 1231 (D. Idaho 2010) ("Because motivations are often difficult to ascertain, 'such an inquiry should be left to the trier of fact' since impermissible motives are often easily masked "behind a complex web of post hoc rationalizations.") (quoting *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1072 (9th Cir. 2003)).  Defendants' Motion for Summary Judgment is denied in this respect.

> b.       *Plaintiff's Return to Light/Modified Duty Work*

In September 2013, according to Defendants, the Bonners Ferry Police Department established Policy 1054 regarding the availability of modified duty assignments.  *See* Mem. in Supp. of MSJ, p. 14, (Docket No. 56).  This policy allows police officers at the City to request light duty work when injured.  *See id*. at p. 15 (citing Policy 1054 (Docket No. 36, Att. 3)). Policy 1054 states in relevant part:

**1054.4 PROCEDURE**

Employees may request assignment to modified duty by providing a signed statement from their health care provider describing their restrictions, limitations and expected duration to their N/A no division levels or titles or his/her designee.  The statement must indicate if the employee requires any workplace accommodations, mobility aids or medical devices.

The N/A no division levels or titles will determine what modified-duty assignments may be available based on the needs of the Department, limitations of the employee and suitability of the employee to work a particular assignment.  Requests for a modified-duty assignment of 20 hours or less may be approved and facilitated by the N/A we usually have only one officer on or N/A no division levels or titles.

**MEMORANDUM DECISION AND ORDER - 22**

Assignments of longer duration are subject to the approval of the Chief of Police or his/her designee.

Policy 1054, pp. 423-24 (Docket No. 36, Att. 3); *see also id*. at p. 423 (within "Purpose and Scope" section of Policy 1054, stating: "Eligibility for modified-duty assignment is subject to the approval of the Chief of Police or his/her designee").

Sometime around December 23, 2013, Plaintiff took medical leave of absence for shoulder surgery. As to that leave of absence, Defendants contend claim that Plaintiff "cannot show that the City retaliated against her because she cannot show that she was **denied** the ability to return to work," because she refused "to take the required forms to her physician." Defs.' Mem. in Supp. of MSJ, p. 15 (Docket No 56). Hence, Defendants would say, there could be no adverse employment action that would support a retaliation claim on this issue.

The Court agrees that the record in this case is clear that Plaintiff did not provide the City with the information needed to evaluate any requests for light/modified duty work assignments. Policy 1054 was implemented in September 2013, months before Plaintiff's shoulder surgery. Further, by all objective accounts, then-Chief David Kramer attempted to facilitate a light/modified duty work situation to accommodate Plaintiff's medication condition and limitations. That no such light/modified duty work ever took place is not an adverse employment action. Defendants' Motion for Summary Judgment is granted in this respect.[10]

---

[10] Though unclear, to the extent Plaintiff is claiming that she was retaliated against by virtue of a delay in returning to *full* duty work (owing to her claims of sexual harassment), that issue contains disputes of material fact. Defendants contend that Plaintiff was required to have her physician certify on the Idaho POST medical form that Plaintiff had no medical restrictions and that she was fit for duty. Plaintiff counters that "[t]his is not in the Police Policy Manual," "[n]o Police Department employee before [her] had ever had this required of them," and "[l]ater, Robert Boone broke his leg and was not required to submit a POST Medical Form when he came back to work." *Compare* Defs.' Am. Stmt. of Material Facts, p. 7 (Docket No. 56, Att. 1), *with* Stmt. of Disp. Fact No. 15 (Docket No. 41, Att. 1). The existing record does not "settle the pond" on the issue, and Defendants' reply briefing does not discuss this more discrete point. *See* Reply in Supp. of MSJ, pp. 9-10 (Docket No. 50).

On April 21, 2014, Plaintiff emailed then-Chief Robert Boone, indicating that she was interested in the Lieutenant position and inquiring about the status (and, if necessary, requesting the revocation) of her November 19, 2013 probation.  *See* 4/21/14 email (Docket No. 37, Att. 5). On April 28, 2014 (at 11:49 a.m.), Chief Boone responded, stating that Plaintiff's probation remained in-effect until November 18, 2014.  *See* 4/28/14 email (Docket No. 37, Att. 5) ("In reviewing the aforementioned documents, an in-depth investigation was completed by the attorney general's office.  On November 19, 2013, then Chief Steve Benkula placed you on (1) one year probationary status pursuant to a violation of Bonners Ferry Police Department Policy Manual Section 328.4, which is 'Failure to Report Sexual Harassment."  That investigation and its outcome has to stand on its own merits.  I will not countermand the previous chief's decisions.").

Later that day (at approximately 1:58 p.m.), City Attorney Andrakay Pluid noticed Plaintiff's marked patrol vehicle parked behind her attorney's office.  *See* Investigation, p. 4 (Docket No. 37, Att. 4).  City Attorney Pluid reported this to Chief Boone and an investigation into possible misconduct (unauthorized absence from work) followed.  *See id*. ("When Ms. Pluid arrived at City Hall she saw Chief Boone and asked him where Corporal Murray was supposed to be.  Chief Boone told her that she (Murray) was supposed to be at the High School.  Ms. Pluid informed Chief Boone of her observations.").

An outside agency, Integrity Investigations, conducted the investigation that followed, which involved, among other things, an interview between the investigating official, Christopher Sullivan, and Plaintiff.  *See id*. at pp. 6-8 (Docket No. 37, Att. 5).  However, Plaintiff failed to

**MEMORANDUM DECISION AND ORDER - 24**

appear for her scheduled interview on May 13, 2014, despite being repeatedly told and ordered to so attend – even after unsuccessfully attempting to garner the City's approval of a liquidated damages proposal from Plaintiff's attorney leading up to the interview. *See id.* Ultimately, the investigation sustained a charge of willful disobedience, concluding:

> Corporal Murray was notified in writing on May 2, 2014 that she was the subject of an administrative investigation and ordered not to discuss same with anyone except the assigned investigator. Corporal Murray signed those advisements. Subsequently, she was told by Deputy Chief Foster Mayo that her interview was scheduled for Friday, May 9, 2014. Murray requested that the date be changed to Tuesday, May 13, 2014 and she was accommodated.

> Corporal Murray's attorney, Tim Wilson attempted to procure City officials' agreement to a liquidated damages proposal prior to Corporal Murray's interview. The City rejected the proposal. Murray was under the impression that that document and its perplexity postponed her interview. She was verbally told by both Deputy Chief Mayo and Chief Boone that the interview was still scheduled for the date and time so indicated and that she was ordered to be present, AND that her refusal to appear would be deemed insubordination.

> Corporal Murray acknowledge receipt of a copy of the Department policy manual on September 24, 2013. Page 129 of that manual, section 340.3.1(b) states in pertinent part that the following illustrates cause for disciplinary action: "*Willful disobedience to any legal order issued by any superior officer of the Department.*"

> Corporal Murray clearly chose to violate the written and verbal orders of her superior officers, and in consideration of her tenure as a police officer and the fact that she aspired to vie for a Lieutenant's position, she knew or reasonably should have known that her refusal to cooperate with this investigation, after being so ordered, was insubordination. Imprudent or defective counsel by a third party does not exempt a police officer from obeying lawful orders.

*Id.* (emphasis in original, citations omitted).

After being placed on administrative leave on May 13, 2014, Plaintiff was terminated on May 29, 2014 (effective June 4, 2014). *See* Admin. Leave Order & Notice of Proposed Discipline (Docket No. 37, Att. 5).

**MEMORANDUM DECISION AND ORDER - 25**

Defendants argue that, because Plaintiff was fired for insubordination, her retaliation claim must fail. *See* Mem. in Supp. of MSJ, pp. 15-16 (Docket No. 56). The Court agrees. Plaintiff was ordered to attend a May 13, 2014 interview relating to her whereabouts on April 28, 2014 and was informed of the consequences if she failed to do so. As a matter of law, on this record, her termination on May 29, 2014 was in connection with her failure to appear at the interview, not because she filed a Notice of Tort Claim. Defendants' Motion for Summary Judgment is granted in this respect.

> ### d. *Police K9 Sally Sue*

Sally Sue was a police K9 (the law enforcement acronym for a dog) and Plaintiff was Sally Sue's "handler." Defendants acknowledge that who owned Sally Sue may involve questions of fact, but they argue that regardless of ownership of the dog, the act of taking Sally Sue out of police service could not be retaliatory as a matter of law because Plaintiff "continued to be paid for a forty-hour workweek with no cut in her hourly pay or demotion" and therefore suffered no adverse employment action. Defs.' Mem. in Supp. of MSJ, p. 16 (Docket No. 56). Plaintiff contests that argument, pointing out that she "lost compensation time for care and training of the K9," as well as the prestige that she says comes with the position of K9 handler. Pls.' Opp. to MSJ, p. 12 (Docket No. 41).

The evidence on the issue of Plaintiff's compensation following Sally Sue's removal from service does not align with Defendant's contentions on this issue. For example, the portions of Plaintiff's deposition cited by Defendants do not confirm that Plaintiff was paid the same. *See* Defs.' Mem. in Supp. of MSJ, p. 16 (Docket No. 56) (citing Pl.'s Dep., 162-163 (Docket No. 41, Att. 6)). Plaintiff refers to an October 31, 2013 letter she received from Chief

Benkula announcing that the City had released all interest in Sally Sue and that, "[s]tarting Friday, November 1st, 2013, the [City] will no longer pay you for the care of the K9." 10/31/13 Ltr. (Docket No. 41, Att. 18). What is left, then, is a dispute of a material fact on this issue. Defendants' Motion for Summary Judgment is denied in this respect.

e. *City Administrator Boorman's Statements*

Plaintiff alleges that City Administrator Boorman retaliated against Plaintiff after she filed her Notice of Tort Claim by telling City workers that she "was just trying to get some money out of the City"; that "they should be careful around" Plaintiff; that the men "should avoid" Plaintiff; and that they should "not talk" to Plaintiff. Compl., ¶¶ 125-30 (Docket No. 5). Plaintiff goes on to allege that, thereafter, City police officers stopped talking to her (except for the most necessary communications) and stopped using her name in regular emails (instead using her title as "School Resource Officer" or "SRO"). *See id.* at ¶¶ 131-32. However, Defendants contend that statements cannot constitute retaliation because Plaintiff did not suffer any adverse employment actions as a result of the statements. *See* Defs.' Mem. in Supp. of MSJ, p. 17 (Docket No. 56).

The Court agrees. It is true that "adverse employment actions" are broadly defined by the Ninth Circuit, not limiting them to actions such discharges, transfers, or demotions. *See Lyons v. England*, 307 F.3d 1092, 1118 (9th Cir. 2002). Instead, adverse employment actions may include lateral transfers, unfavorable job references, and changes in work schedules, but they do not include "every offensive utterance by co-workers, because offensive statements by co-workers do not reasonably deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000) (adverse employment action is adverse

treatment that "is reasonably likely to deter the charging party or others from engaging in protected activity.").  What Plaintiff describes here by way of co-workers talking to her less and identifying her only by her title in emails, while juvenile in nature, is not actionable as an adverse employment action.  *See Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("[O]stracism suffered at the hands of coworkers cannot constitute an adverse employment action.") (citing *Strother v. Southern California Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996) ("[M]ere ostracism in the workplace is not enough to show an adverse employment decision")); *see also Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) (being scolded and/or bad-mouthed by others in workplace does not constitute adverse action).  Defendants' Motion for Summary Judgment is granted in this respect.

> ### f.  Disclosure of Plaintiff's Notice of Tort Claim

Plaintiff alleges that, despite her Notice of Tort Claim containing "personal information," the City released it to the public within 48 hours of receiving it, which, according to Plaintiff, was a violation of sate law, a violation of the City's own policy, and caused her and her husband "damage."  Compl., ¶¶ 135-39 (Docket No. 5); *see also id*. at ¶¶ 202-08.  Defendants argue that its disclosure does not constitute retaliation because it is a public record under the Idaho Public Records Act and is therefore subject to release to the media.  *See* Defs.' Mem. in Supp. of MSJ, p. 17 (Docket No. 56).  Plaintiff disagrees, arguing that "it was incumbent upon the City to redact confidential information before disclosure."  Pls.' Opp. to MSJ, p. 17 (Docket No. 41).

The Court does not need to consider the question of whether Plaintiff's Notice of Tort Claim should have been released in the first instance, or whether information it contained should have been redacted, because even if Plaintiff is correct as to either or both of those contentions,

she still cannot allege that an adverse employment action from such facts that would support a retaliation claim. This is not to say that Defendants' actions were proper under other legal templates (*e.g.*, as to whether statutory law was followed, or whether some other common law claim might arise from such facts). Rather, the Court rules that, in the context of a retaliation claim (the specific premise of Defendants' argument), there is no adverse *employment* action associated with the release of her Notice of Tort Claim. Defendants' Motion for Summary Judgment is granted in this respect.

        4.     <u>State Law Claims</u>

        *a.*     *Plaintiff's Negligence-Based Claims and Defamation Claim*

Plaintiff's negligent hiring, training, and supervision claims appear to be directed at those actors involved in the decisions that she believes were erroneous – apparently contending that these actors' conduct toward her in the various respects that support her underlying harassment and retaliation claims are also actionable for a tort claim of negligence. *See, e.g.*, Compl., ¶ 312 (Docket No. 5) ("Chief Boone's lack of experience caused him to make administrative errors which resulted in damage to Tiffany Murray."); *see also id.* at ¶ 422 ("Defendant, City of Bonners Ferry, failed in its supervisory capacity to create an inspection for, or a corrective policy to ensure that the personnel of the City were protected from sexual harassment, religious harassment, racial harassment, unauthorized or illegal release of private information, torts being committed against them by agents of the City, retaliation for reporting violations of law or policy, and wrongful termination for reporting wrongdoing."); *id.* at ¶¶ 423-26 ("Said training was necessary in order to run the City in compliance with state law . . . federal law . . . [and] . . . to avoid employees of the City being damaged by the tortious acts of its employees against others.").

Rather than attacking the merits of these claims on their face, Defendants contend that, as to each such claim, they are "entitled to immunity under the discretionary function prong of the Idaho Tort Claims Act, which provides immunity to 'a governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent.'" Defs.' Mem. in Supp. of MSJ, p. 18 (Docket No. 56) (quoting I.C. § 6-904(1)). Plaintiff does not dispute Defendants' argument that the "discretionary function" provision of the Idaho Tort Claims Act can be raised against her negligence claims.[11] However, Plaintiff argues that "immunity is not available to public actors who act with malicious intention." Pls.' Opp. to MSJ, p. 18 (Docket No. 41).[12]

"Malice," as used in the Idaho Tort Claims Act, is defined as "the intentional commission of a wrongful or unlawful act, without legal justification or excuse and with ill will, whether or not injury was intended." *Anderson v. City of Pocatello*, 731 P.2d 171, 182-83 (Idaho 1986). Even when liberally construing in her favor the facts describing Plaintiff's contentious tenure with the Bonners Ferry Police Department, the Court cannot discern a triable issue of fact as to whether Defendants acted with malice in either negligently hiring, training, and supervising its employees, or, even, in undertaking the actions that Plaintiff alleges represent sexual harassment and retaliation.

---

[11] *Cf. Brooks v. Logan*, 903 P.2d 73, 77 (Idaho 1995) ("Routine matters not requiring evaluation of broad policy factors will likely be 'operational,' whereas decisions involving a consideration of the financial, political, economic, and social effects of a particular plan are likely 'discretionary' and will be accorded immunity."

[12] As a preliminary matter, the malice requirement exists only as to governmental employees, not the governmental entity itself. *See Hoffer v. City of Boise*, 257 P.3d 1226, 1228 (Idaho 2011) ("The plain language of the first clause of that section exempts governmental entities from liability for the torts it lists, whether or not there has been an allegation of malice or criminal intent.") (citing *White v. Univ. of Idaho*, 797 P.2d 108, 108-09 (Idaho 1990)).

In regard to the conduct by Defendants alleged in support of Plaintiff's claims that survive summary judgment, there is unquestionably space for her to argue that it was unjustified and improper. However, Plaintiff conflates her contentions that the remaining Defendants were wrong (or committing a wrongful act) with being malicious. *See e.g.*, Pls.' Opp. to MSJ, p. 18 (Docket No. 41) ("The fact that this policy had such limited applicability makes Chief Boone's actions targeted at a single employee malicious in nature."). But Idaho Code section 6-904 expressly distinguishes these concepts and ipse dixit arguments alone cannot establish (or create a dispute of fact toward establishing) the necessary separate element – malice. *See, e.g., Beco Const. Co., Inc. v. City of Idaho Falls*, 865 P.2d 950, 956 (Idaho 1993) (even assuming evidence represented evidence of wrongful act (abuse of process), the same "evidence in no way indicates these actions were conducted at the malicious direction of the City. There is nothing in the above evidence by which one could reasonably infer that conduct which constitutes the abuse of process claim was motivated by ill will on the part of the City."). More is needed, but lacking. Defendants' Motion for Summary Judgment is granted in this respect.[13]

> b.      *Plaintiff's Breach of the Covenant of Good Faith and Fair Dealing Claim*

Idaho law implies a covenant of good faith and fair dealing when doing so is consistent with the express terms of an agreement between contracting parties. *See Idaho Power Co. v. Cogeneration, Inc.*, 9 P.3d 1204, 1214 (Idaho 2000). When it is implied, "[t]he covenant requires that the parties perform, in good faith, the obligations imposed by their agreement." *Id*. Only a party to a contract may assert a claim for breach of the covenant of good faith and fair

---

[13] Plaintiff's defamation claim is dismissed as well for the same reasons. *See* I.C. § 6-904(3) (expressly exempting certain causes of action from the general rule that entity is subject to liability, including claim for defamation).

dealing. *See Tolley v. THI Co.*, 92 P.3d 503, 511 (Idaho 2004). Even then, one can maintain a claim for breach of the covenant only when he or she "is denied the right to the benefits of the agreement [the parties] entered into." *See id*.

Defendants argue that there is no contract between Plaintiff and the Defendants and, therefore, there can be no breach of the covenant of good faith and fair dealing claim against them. *See* Mem. in Supp. of MSJ, pp. 19-20 (Docket No. 56). However, whether Plaintiff has an employment contract with Bonners Ferry Police Department (a non-party) or the City (a party) is not clear. *See, e.g.*, *Ferguson v. City of Orofino*, 953 P.2d 630, 632 (Idaho Ct. App. 1998) (discussing breach of implied covenant of good faith and fair dealing claim brought by plaintiff, employed with police department, against city for preventing him from using personal leave time). For example, as Plaintiff points out, Defendants appear to acknowledge that Plaintiff worked for the City as a police officer and, likewise, got paid by the City. *See* Pls.' Opp. to MSJ, p. 19 (Docket No. 41). Moreover, elsewhere in the record, (1) the City's Sexual Harassment Policy and Personnel Policy applied to Plaintiff, she signed them, and they motivated certain decisions impacting Plaintiff (*see* City Policies (Docket No. 37, Att. 1); (2) Investigator Sullivan's investigation was commissioned by the City (*see* Investigation, p. 1 (Docket No. 37, Att. 4)); and (3) the City issued the classification specification for Plaintiff's position as School Resource Officer (*see* Classification (Docket No. 36, Att. 3)).

Without confirming here, that Plaintiff and the City entered into an employment contract, an issue materializes as to whether that is in fact the case, which can be tested further at trial and, if necessary, upon a motion for directed verdict. Until then, Defendants' Motion for Summary Judgment is denied in this respect.

**MEMORANDUM DECISION AND ORDER - 32**

**B.     Plaintiff's Motion to Amend to Add Claim for Punitive Damages (Docket No. 35)**

Plaintiff may claim punitive damages only if she establishes a reasonable likelihood of proving, by clear and convincing evidence, that Defendants' conduct was oppressive, fraudulent, malicious, or outrageous. *See supra*. Plaintiff has not met this standard.

As to various individual actors, Plaintiff identifies what she believes to be the requisite bad acts, followed by the necessary and accompanying bad state of mind for those acts, to support a claim for punitive damages. *See* Pls.' Mem. in Supp. of Mot. to Am., pp. 4-20 (Docket No. 35, Att. 1). While it may be true that Plaintiff has a reasonable likelihood of proving certain of these alleged bad acts by clear and convincing evidence at trial, the same cannot be said for her ability on this record to so prove that these same individuals acted with an extremely harmful state of mind. Here again, Plaintiff tends to argue that the alleged bad acts themselves are proof themselves of a bad state of mind. *See id*. But this is not the case; otherwise, nearly every action seeking to recover from a claimed wrong would also support a claim to punitive damages simply by virtue of the existence of those wrongs. Idaho's statutory and case law, however, require a party seeking to add a claim for punitive damages to go *beyond* simply arguing that certain Defendants' actions were an extreme deviation from reasonable standards of conduct, performed with an understanding of (or disregard for) the likely consequences of those actions.[14]

There is no debate that the actions Plaintiff describes are in varying degrees distasteful, obnoxious, and offensive – Plaintiff's arguments in these respects do a sufficient job of

---

[14] Plaintiff also argues that, because certain actions were deliberate and willful, a punitive damages claim is warranted. *See* Pls.' Mem. in Supp. of Mot. to Am., p. 7 (Docket No. 35, Att. 1) ("Assistant Chief Minor acted with an extremely harmful state of mind; specifically, he deliberately and willfully committed numerous sexual assaults and batteries against Tiffany Murray."). This is not the law. *See supra* (citing *Cummings*, 336 P.3d at 296, n.5 ("gross negligence or deliberate or willful conduct is not sufficient for an award of punitive damages.").

establishing as much. And such actions can be circumstantial evidence of an extremely harmful state of mind, subject to differing inferences. Still, Plaintiff has not established a reasonable likelihood of proving, by clear and convincing evidence, that Defendants' actions were fueled by an extremely harmful state of mind. Accordingly, in the exercise of its discretion on the matter, the Court denies Plaintiff's request to add a claim for punitive damages. That denial is made without prejudice to later seek such an amendment following evidence submitted at trial, if appropriate. Certainly in the trial arena, the context of such statements can be more fully unveiled, and that further unveiling might prove them to be more boorish than they already appear on the paper record, or they might prove to be oppressive, fraudulent, malicious or outrageous in a clear and convincing way. But on this record, there is no reasonable likelihood that the latter measure can be met. Hence, Plaintiff's Motion to Amend to Add Claim for Punitive Damages is denied.

## IV. ORDER[15]

Based on the foregoing, IT IS HEREBY ORDERED that:

1.     Defendants' Motion for Summary Judgment (Docket Nos. 34 & 56) is GRANTED, in part, and DENIED, in part, as follows:

a.     Plaintiff's hostile work environment claim is dismissed as to the City; in this respect, Defendants' Motion for Summary Judgment is GRANTED. Plaintiff's hostile work environment claim otherwise survives; in this respect, Defendants' Motion for Summary Judgment is DENIED.

---

[15] This Decision addresses arguments raised in Defendants' Motion for Summary Judgment. To the extent Plaintiff raises additional arguments in support of claims not discussed within Defendants' Motion for Summary Judgment (quite possible, given the sheer volume and sometimes erratic nature of their briefing and exhibits), they are naturally not resolved here.

**MEMORANDUM DECISION AND ORDER - 34**

b.  Plaintiff's quid pro quo sexual harassment claim is dismissed; in this respect, Defendants' Motion for Summary Judgment is GRANTED.

c.  Plaintiff's retaliation claim based on Plaintiff's November 19, 2013 Probation survives; in this respect, Defendants' Motion for Summary Judgment is DENIED.

d.  Plaintiff's retaliation claim based on Plaintiff's return to light/modified duty work is dismissed; in this respect, Defendants' Motion for Summary Judgment is GRANTED.  However, any retaliation claim based on Plaintiff's return to full duty work remains; in this respect, Defendants' Motion for Summary Judgment is DENIED.

e.  Plaintiff's retaliation claim based on Plaintiff's May 29, 2014 termination is dismissed; in this respect, Defendants' Motion for Summary Judgment is GRANTED.

f.  Plaintiff's retaliation claim based on Police K9 Sally Sue survives; in this respect, Defendants' Motion for Summary Judgment is DENIED.

g.  Plaintiff's retaliation claim based on City Administrator Boorman's statements is dismissed; in this respect, Defendants' Motion for Summary Judgment is GRANTED.

h.  Plaintiff's retaliation claim based on the disclosure of Plaintiff's Notice of Tort Claim is dismissed; in this respect, Defendants' Motion for Summary Judgment is GRANTED.

i.  Plaintiff's Negligence-Based Claims and Defamation Claim are dismissed; in this respect, Defendants' Motion for Summary Judgment is GRANTED.

j.  Plaintiff's Breach of the Covenant of Good Faith and Fair Dealing Claim survives; in this respect, Defendants' Motion for Summary Judgment is DENIED.

**MEMORANDUM DECISION AND ORDER - 35**

2. Plaintiff's Motion to Amend to Add Claim for Punitive Damages (Docket No. 35)

is DENIED.



DATED: **September 28, 2017**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge